# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: CR-23-311-G |
| | ) |
| OSCAR REYNALDO GOMEZ, | ) |
| | ) |
| Defendant. | ) |

## SENTENCING MEMORANDUM

Defendant Oscar Reynaldo Gomez submits this Sentencing Memorandum requesting a guideline sentence of 60 months. (PSR ¶ 66). This sentence is sufficient and not greater than necessary to comply with 18 U.S.C. § 3553(a)(2). The Presentence Investigation Report does not identify any factors for consideration of an upward variance or upward departure. (PSR ¶¶ 84-85).

The Government has requested an upward variance to a sentence of 120 months, based primarily on the scope of the resulting fire and Mr. Gomez's dated criminal history. Respectfully, Mr. Gomez's history and characteristics do not require a sentence above the guideline range of 60 months, particularly when the Court can fashion a period of three years of supervision to assist Mr. Gomez. There is no need for an upward variant sentence.

**Nature and Circumstances of the Offense**

Untreated for his mental health condition and in the midst of homelessness and drug abuse, Mr. Gomez set a small fire at night within the Gods of No Limits Church. It was the early morning hours of April 17, 2023 and the building was unoccupied. No internal

1

sprinkler system prevented the fire from spreading, and soon multiple 911 calls were made reporting the structure fire. Oklahoma City Fire Department responded and eventually extinguished the fire. The building was a total loss. No one was injured.

Eventually, Mr. Gomez was interviewed about the fire and admitted setting the fire. His explanation was nonsensical and related to perceived grievances committed by the pastor of the church. As is clear both from his explanation at the time, and his subsequent competency proceedings, Mr. Gomez was mentally ill and in need of treatment.

The confluence of Mr. Gomez's homelessness, substance abuse, and untreated mental health condition is unlikely to occur again. While this offense resulted in a significant fire, Mr. Gomez's history and characteristics indicate this was an aberration for Mr. Gomez.

**History and Characteristics of Mr. Gomez**

Mr. Gomez is originally from California, having moved there after being born in Mexico.[1] He graduated high school and worked for many years. As is clear from his criminal history, Mr. Gomez has struggled with substance abuse, most notably alcohol use. His prior convictions have almost exclusively involved driving under the influence. Mr. Gomez reports being young, partying, and not thinking. His father had a drinking problem. And while these are significant offenses, they also point to a larger problem with alcoholism. Shortly after he had issues with his wife, Mr. Gomez moved out of California.

---

[1] Another consideration for the Court is the possibility Mr. Gomez will be removed from the United States after service of his sentence. As a lawful permanent resident (and not a citizen), there are procedures to remove Mr. Gomez from the United States following this conviction.

He first went to Utah to be with an uncle that was dying of cancer. While there, Mr. Gomez worked and met a woman, Crystal Burney. He moved to Oklahoma and had two children. Mr. Gomez remained employed and out of trouble. One of his jobs was at Boardman, where he built pressure vessels and welded. However, Mr. Gomez and Crystal broke up. This began the descent for Mr. Gomez.

Oleta Burney, Crystal's mother, reported observing Mr. Gomez's mental decline. She reports Mr. Gomez was a "nice and hard-working guy" when he was not affected by mental illness or drugs. She recalls a Christmas morning when Mr. Gomez lost touch with reality and started questioning everything. Mr. Gomez still checked with her to find out how his kids were doing. And when Mr. Gomez was around Ms. Burney, he was on his best behavior. But many times, Mr. Gomez did not want his in-laws to see him disheveled and without stable housing.

For the last five years or so, Mr. Gomez has been unemployed and without housing. As he reports, he is just surviving. Mr. Gomez lost track of a long period of time. All the while, Mr. Gomez has not had stable housing, employment, or critical mental health and substance abuse treatment. But his history demonstrates he can live a stable, employed and drug free life.

**The Need for the Sentence Imposed**

The statutory factors in 18 U.S.C. § 3553(a) do not require a prolonged sentence of incarceration. The instant offense is serious and Mr. Gomez acknowledges as much. Though it may be suggested Mr. Gomez's dated criminal history suggests a lack of respect for the law, or that a sentence is required for adequate deterrence, or to protect the public,

Mr. Gomez submits a prolonged period of incarceration beyond five years is counterproductive. Mr. Gomez is approaching 60 years of age. Statistically, recidivism rates decline as individuals age. *See, e.g.*, *United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) ("[S]tudies demonstrate that the risk of recidivism is inversely related to an inmate's age."). But even more than that, Mr. Gomez wants the Court to know he is determined "to get right." He is running out of time. Mr. Gomez worries about how much longer he will stay healthy. This entire process has resulted in a result for Mr. Gomez, separated from the substances driving his underlying mental health condition.

Concerning the need to afford adequate deterrence to criminal conduct, the empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a

4

thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Also relevant is USSG §5K2.20, *Aberrant Behavior*. In general, USSG § 5K2.20 permits the Court to depart downward if the defendant committed a single criminal act that was committed without significant planning, was of limited duration, and represents a marked deviation from an otherwise law-abiding life. While Mr. Gomez's personal history may not strictly constitute a law-abiding life, the Court is free to consider the aberrant behavior of Mr. Gomez when considering whether to vary from the advisory guideline.

Similarly, the principles behind USSG § 5K2.13 – diminished capacity – are applicable. Under this policy statement, a downward departure may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity, and the diminished mental capacity contributed substantially to the commission of the offense. The departure is unavailable if the reduced mental capacity was caused by the voluntary use of drugs, if the facts of the offense indicate a need to protect the public, if the defendant's criminal history indicates a need to incarcerate the defendant, or if the offense involved a crime not involved in this case. While there is evidence to suggest Mr. Gomez voluntarily used drugs, his underlying mental health condition was clearly compromised. While the instant case may not fit entirely within USSG § 5K2.13, the principles behind leniency for related conduct supports a guideline sentence.

A sentence of five years, coupled with three years of supervised release, is a significant sentence. Mr. Gomez will remain incarcerated. Importantly, he will be transitioned onto supervised release with special conditions directed at addressing his mental health, substance abuse, and employment issues at the heart of this aberrant conduct.

## CONCLUSION

The statutory requirements of 18 U.S.C. § 3553(a) do not require a lengthy prison beyond the guideline range of 60 months.

Respectfully submitted,

/s/ *Kyle E. Wackenheim*
KYLE E. WACKENHEIM, OBA No. 30760
ASSISTANT FEDERAL PUBLIC DEFENDER
OFFICE OF THE FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF OKLAHOMA
215 Dean A. McGee   Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405-609-5930
Telefacsimile: 405-609-5932
Electronic Mail: Kyle_Wackenheim@fd.org
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF Registrants:

Assistant United States Attorney Daniel Gridley

/s/ *Kyle Wackenheim*
Kyle Wackenheim